1  Craig A. Brandt (SBN 133905)
   LAW OFFICE OF CRAIG A. BRANDT
2  5354 James Avenue
   Oakland, CA 94618
3  Telephone: (510) 601-1309
   Email: craigabrandt@att.net
4
   Attorney for Plaintiff
5  EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC

6              UNITED STATES DISTRICT COURT

7              NORTHERN DISTRICT OF CALIFORNIA

8

9  EDEN ENVIRONMENTAL CITIZEN'S          )   Case No: _____
   GROUP, LLC, a California limited liability )
   company,                              )   **COMPLAINT FOR INJUNCTIVE AND**
10                                        )   **DECLARATORY RELIEF, CIVIL**
            Plaintiff,                    )   **PENALTIES AND REMEDIATION**
11                                        )
        vs.                               )   **(Federal Water Pollution Control Act, 33**
12                                        )   **U.S.C. §§1251 et seq.)**
   SHASTA BEVERAGES, INC., as a           )
13 corporation organized and existing under the )
   laws of the State of Delaware, and DOES 1- )
14 10, inclusive,                         )
                                          )
            Defendant.                    )
15 _____ )

16      Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") hereby

17 brings this civil action pursuant to the Federal Water Pollution Control Act, also known as the

18 Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 et seq.

19                          **INTRODUCTION**

20      1.   This action is a citizen suit for injunctive relief, declaratory relief, civil penalties, and

21 remediation against Defendant for current and ongoing violations of the National Pollutant

22 Discharge Elimination System ("NPDES") permit requirements of the CWA.

23

24

2.    On or about October 23, 2020, EDEN provided a Notice of Defendant's violations to Defendant Shasta Beverages, Inc. ("SHASTA BEVERAGES"), by certified mail, at 26901 Industrial Blvd., Hayward, California, ("the Facility"), as required by the CWA. 33 U.S.C. § 1365(b)(1)(A).

3.    On or about November 13, 2020, EDEN provided a Notice of Defendant's violations of the CWA to the (1) Administrator of the United States Environmental Protection Agency ("EPA"), (2) EPA's Regional Administrator for Region Nine, and (3) Executive Director of the State Water Resources Control Board ("State Board").

4.    A copy of EDEN's Notice of Intent to Sue is attached hereto as Exhibit A and incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

5.    More than sixty days have passed since EDEN's Notice was properly and lawfully served on Defendant, the State Water Resources Control Board ("State Board"), and the Regional and National EPA Administrators.  EDEN is informed and believes, and thereupon alleges, that neither the National EPA, nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under section 309(g) of the Clean Water Act ("CWA"), 33 U.S.C. § 1319(g).

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

6.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. section 1331 (federal question), and 33 U.S.C. section 1365(a) (CWA citizen suit jurisdiction). The relief requested is authorized pursuant to 28 U.S.C. sections 2201-2202 (declaratory relief), 33 U.S.C.

1  sections 1319(b), 1365(a) (injunctive relief), and 33 U.S.C. sections 1319(d), 1365(a) (civil

2  penalties).

3      7.    The Permit under which this case arises is a Federally required permit based upon

4  California state substantive law.  (*Southern California Alliance of Publicly Owned Treatment*

5  *Works v. U.S. Environmental Protection Agency* (9th Cir. 2017), 853 F.3d 1076; *Dept. of*

6  *Finance v. Commission on State Mandates,* 1 Cal.5th 749 (2016).)

7      8.    By its express language, a violation of the State permit constitutes a per se violation of

8  the Federal Clean Water Act.  (California's Industrial General Permit Order 2014-0057 DWQ,

9  NPDES Order No. CAS000001, Section XXI.A)

10      9.    Venue is proper because Defendant reside in and the events or omissions giving rise to

11  EDEN's claims occurred in this District. 28 U.S.C. §1391(b)(1), (2). Venue is also proper

12  because the Facility's CWA violations have occurred and are occurring within the District. 33

13  U.S.C. § 1365(c)(1).

14  **PARTIES**

15      10.    Plaintiff EDEN ENVIRONMENTAL CITIZEN'S GROUP, LLC ("EDEN") is an

16  environmental membership group organized under the laws of the State of California as a limited

17  liability company on June 1, 2018.  EDEN previously existed as an unincorporated

18  environmental citizen's association, with members who remain associated with EDEN as of the

19  date of the filing of this Complaint.

20      11.    EDEN's organizational purpose is the protection, preservation and enhancement of

21  California's waterways.   Its mission is implemented by enforcing the provisions of the Federal

22  Clean Water Act and California's Industrial General Permit by seeking redress from

23

24

1   environmental harms caused by Industrial Dischargers who pollute the Waters of the United

2   States, through community education and citizen suit enforcement when necessary.

3   12.    EDEN's members donate their time and money resources to protect, enhance, and assist

4   in the preservation and restoration of rivers, creeks, streams, wetlands, vernal pools, and their

5   tributaries located in California.

6   13.    EDEN has members that reside, work and pursue recreational activities near the affected

7   Receiving Waters. Defendant SHASTA BEVERAGES discharges storm water into a municipal

8   storm drain system along Industrial Boulevard in Hayward, California, as well as, the drainage

9   ditch to the west of the Facility, each of which then discharges to Alameda Creek, a tributary of

10   the San Francisco Bay which is the "Receiving Waters" for the Facility. Eden members use those

11   waters and their watersheds for surfing, kayaking, camping, cycling, recreation, sports, fishing,

12   swimming, hiking, photography, nature walks and scientific study.  Their use and enjoyment of

13   these natural resources have been and continue to be adversely impaired by Defendant's failure

14   to comply with the procedural and substantive requirements of the California Industrial General

15   Permit and Federal Clean Water Act.

16   14.    EDEN has standing as an association to bring this suit against Defendant, as at least one

17   of EDEN's current members is experiencing ongoing and continuing harm particular to him or

18   her as a specific result of Defendant's violations of the CWA, and the resulting adverse effects to

19   the environment and the Receiving Waters downstream from the Facility, and has experienced

20   such harm since at least the date that EDEN provided to Defendant a 60-day Notice of Intent to

21   Sue.

22   15.    Specifically, the individual member(s) who are experiencing harm from Defendant's

23   violations of the CWA are reluctant to utilize the Receiving Waters downstream from the

24

1    Facility as specified in Paragraph 13, above, due to the pollution caused by Defendant's

2    environmental violations that EDEN's members believe has entered into the Facility's Receiving

3    Waters; and the aesthetic and recreational interests of these members has been adversely

4    impacted.

5    16.    Defendant's ongoing violations of the California Industrial General Permit and the CWA

6    have and will continue to cause irreparable harm to EDEN and certain of its current members,

7    for which they have no plain, speedy, or adequate remedy.  The relief requested will redress the

8    ongoing injury in fact to EDEN and its members.  Litigation of the claims asserted and the relief

9    requested in this Complaint will not require the participation in this lawsuit of individual

10   members of EDEN.

11   17.    EDEN is informed and believes, and on such information and belief alleges, that

12   Defendant SHASTA BEVERAGES located at 26901 Industrial Boulevard, Hayward, California,

13   was formed on or about March 7, 1986, as a corporation organized and existing under the laws of

14   the State of Delaware.

15   18.    EDEN is informed and believes, and on such information and belief alleges, that,

16   Defendant SHASTA BEVERAGES, on or about March 26, 1992, submitted a Notice of Intent

17   ("NOI") to be authorized to discharge storm water from the Facility. EDEN is further informed

18   and believes, and on such information and belief alleges, that on or about May 6, 2015

19   Defendant SHASTA BEVERAGES, submitted an NOT to be authorized to discharge storm

20   water from the Facility under the California Industrial General Permit ("General Permit") and

21   was assigned Waste Discharger Identification number ("WDID") 2 011004633, according to the

22   Regional Water Board's records.

23

24

**STATUTORY BACKGROUND**

19.     Congress declared that the Federal Clean Water Act was designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" through federal and state cooperation to develop and implement "programs for preventing, reducing, or eliminating the pollution of navigable waters and ground waters." 33 U.S.C. §§ 1251(a), 1252(a).

20.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

21.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

22.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

General Permit

23.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on November 19, 1991, and modified it on September 17, 1992.   The State Board reissued the General Permit on April 17,

1997, and again on April 1, 2014 (the "2015 Permit" or "General Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015.  The 2015 Permit went into effect on July 1, 2015.  The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

24.   In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

25.   The General Permit contains several prohibitions. Effluent Limitation Section V.A of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition Section III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.

26.   Receiving Water Limitation Section VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

27.   In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity which have not obtained an

individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

28.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP"). The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The objective of the SWPPP requirement is to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges. General Permit, Section X.C. These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.

29.     To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary. General Permit, Section X.B.

30.     Failure to develop or implement an adequate SWPPP, or to update or revise an existing SWPPP as required, is a violation of the General Permit. General Permit, Fact Sheet Section I .1.

31.     Sections X.D – X.I of General Permit set forth the requirements for a SWPPP. Among other requirements, the SWPPP must include a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of a specific mandatory set of minimum BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges.

32.    The General Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  General Permit, Section X.H.2.  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the General Permit.

33.    The General Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  General Permit, Section X.H.4, 5.

34.    The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program. The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.

35.    As part of their monitoring program, Dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.

36.    Section XI.B of the General Permit requires that Dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30), and that the samples be collected from all outfalls identified in the Facility SWPPP.

37.     A QSE is a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.  General Permit Section XI.B.2.

38.     Once the storm water samples have been collected, the General Permit requires that the Discharger deliver the samples to a qualified laboratory for analysis within 48 hours of collection (General Permit, Attachment H) and upload into SMARTS the resulting laboratory reports within 30 days from receipt of the report.  General Permit Section XI.B.4.

39.     Facilities are also required to make monthly visual observations of storm water discharges. The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  General Permit, Section XI.A.

40.     The General Permit requires operators to conduct an Annual Comprehensive Facility Compliance Evaluation ("Annual Evaluation") that evaluates the effectiveness of current BMPs and the need for additional BMPs based on visual observations and sampling and analysis results. General Permit, Section XV.

41.     Under the General Permit, facilities must analyze storm water samples for pH, oil & grease and total suspended solids, as well as additional parameters indicated in the Permit by facility type and those parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment.  General Permit, Section XI.B.6.c.

42.     The United States EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT. These benchmarks represent pollutant concentrations at which a storm water

discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.

43.     The Numeric Action Levels ("NALs") in the General Permit are derived from these benchmarks. The Permit incorporates annual NALs, which are derived from the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset.

44.     The following annual NALs have been established under the General Permit for pollution parameters applicable to the Facility: pH – 6.0 - 9.0 standard units ("S.U."); total suspended solids ("TSS") – 100 mg/L; oil & grease ("O&G") – 15 mg/L.

45.     An exceedance of an annual NAL occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30.  An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH.  General Permit Section XII.A.

46.     When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status."  General Permit Section XII.C.

47.     For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the

exceedance is solely due to the presence of the pollutant in the natural background.  General Permit Section XII.D.

48.     Section XVI.A. of the General Permit requires that all Dischargers must certify and submit via SMARTS an Annual Report no later than July 15th following each reporting year using the standardized format and checklists in SMARTS.

49.     Furthermore, Section XXI.L of the General Permit provides that all documents submitted to SMARTS, including SWPPPs and Annual Reports, be certified by a Legally Responsible Person ("LRP") or Duly Authorized Representative ("DAR") of the Facility, with the following certification:

"I certify under penalty of law that this document and all Attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted. Based on my inquiry of the person or persons who manage the system or those persons directly responsible for gathering the information, to the best of my knowledge and belief, the information submitted is, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

50.     Section XXI.N of the General Permit provides that any person who knowingly makes any false material statement, representation, or certification in any record or other document submitted or required to be maintained under the General Permit, including reports of compliance or noncompliance shall upon conviction, be punished by a fine of not more than $10,000, or by imprisonment for not more than two years, or by both.  *See also* Clean Water Act section 309(c)(4)

San Francisco Bay Regional Basin Plan

51.     The Water Quality Control Board, San Francisco Bay Region has adopted the "San Francisco Bay Basin (Region 2) Water Quality Control Plan" ("Basin Plan"), as amended by

1    Resolution No. R2-2010-0100, setting forth the Water Quality Standards ("WQS") and

2    beneficial uses for San Francisco Bay and its tributaries.

3    52.    The Beneficial Uses for San Francisco Bay are industrial service supply, shellfish

4    harvesting, fish migration, preservation of rare and endangered species, fish spawning,

5    commercial and sportfishing, estuarine habitat, wildlife habitat, recreational activities involving

6    contact with water, recreational activities involving proximity to water, and navigation. *See*

7    Basin Plan, Table 2-1.

8    53.    Surface waters that cannot support the Beneficial Uses of those waters listed in the Basin

9    Plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water

10    Act, 33 U.S.C. § 1313(d).

11    54.    Polluted discharges from industrial sites, such as the Facility, contribute to the

12    degradation of these already impaired surface waters and aquatic-dependent wildlife. Discharges

13    of pollutants at levels above WQS contribute to the impairment of the Beneficial Uses of the

14    waters receiving the discharges.  WQS applicable to dischargers covered by the Storm Water

15    Permit include, but are not limited to, those set out in the Basin Plan and in the Criteria for

16    Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38.

17    55.    The Basin Plan sets forth, among other things, narrative WQS for floating material, Oil &

18    Grease ("O&G"), sediment, settleable matter, and suspended materials, and sets forth numeric

19    WQS for pH, arsenic, cadmium, chromium VI, copper, cyanide, lead, mercury, nickel, selenium,

20    silver, tributyltin, zinc, and hydrocarbons ("PAHs"). *See* Basin Plan §§ 3.3.6, 3.3.7, 3.3.9, 3.3.12-

21    3.3.14, 3.3.21, and Table 3-3.

22    56.    The Basin Plan also includes site specific objectives ("SSOs"), which are WQS for

23    specific sites, for certain pollutants of concern, including copper and nickel. *See* Basin Plan,

24

Table 3-3A.  The CTR includes numeric criteria set to protect human health and the environment in the State of California.

57.    Discharges with pollutant levels in excess of the CTR criteria, the Basin Plan standards, and/or other applicable WQS are violations of Receiving Water Limitations in Section VI(A) of the General Permit.

Water Quality Impairment Area

58.    The San Francisco Bay is listed for water quality impairment on the most recent Section 303(d) - list of the General Permit for the following: chlordane; dichlorodiphenyltrichloroethane (DDT); dieldrin; dioxin compounds (including 2,3,7,8- tetrachlorodibenzo-pdioxin); furan compounds; invasive species; mercury; polychlorinated biphenyls (PCBs); PCBs (dioxin-like); selenium, and trash.

Citizen Suit Provision of the CWA

59.    Under the CWA, any citizen may commence a civil action against any person who is alleged to be in violation of an effluent standard or limitation under the CWA or an Order issued by a State with respect to such a standard or limitation. 33 U.S.C. §1365(a)(1). No action may be commenced "prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the [EPA] Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order." 33 U.S.C. § 1365(b)(1)(A).  By including a citizen suit provision in the CWA, Congress ensured that the purposes and requirements of the CWA would be enforced, either by the United States government or by concerned citizens.

60.    In furtherance of the water preservation goals established by the CWA, the citizen suit provision confirms the district court's jurisdiction to apply any appropriate civil penalties under section 1319(d).  33 U.S.C. § 1365(a). Section 1319(d) declares that any person who violates any

1    permit condition or limitation implementing any of such sections in an NPDES permit shall be

2    subject to a civil penalty not to exceed $46,192 per day for each violation occurring before

3    November 2, 2015, and $51,570.00 per day per violation for violations occurring after November

4    2, 2015.   33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; General Permit XXI.Q.1.

5    61.    Violations of provisions of the General Permit, including those detailed below, constitute

6    violations of the CWA and are subject to civil penalties. General Permit § XXI; 33 U.S.C. §§

7    1319(d), 1342; 40 C.F.R. §§ 19.1-19.4.

8                    **FACTUAL ALLEGATIONS WHICH GIVE RISE TO CLAIMS**

9    62.    Defendant SHASTA BEVERAGES is an establishment that is primarily engaged in

10   manufacturing soft drinks and carbonated waters.

11   63.    EDEN is informed and believes that the Facility falls within the standard industrial

12   classification ("SIC") 2086 - Bottled and Canned Soft Drinks and Carbonated Waters.

13   64.    The Facility discharges storm water into a municipal storm drain system along Industrial

14   Boulevard in Hayward, California, as well as, the drainage ditch to the west of the Facility, each

15   of which then discharges to Alameda Creek, a tributary of the San Francisco Bay that is the

16   "Receiving Waters" for the Facility.

17   65.    EDEN is informed and believes that Defendant SHASTA BEVERAGES stores industrial

18   materials outdoors that can be exposed to storm water, eroded by wind, and otherwise

19   contaminate the surrounding watershed.

20   66.    EDEN is informed and believes that based on its investigation, including a review of the

21   Regional Water Board's records, aerial photography storm water is collected and discharged

22   from the Facility through a series of channels that discharge via at least one outfall.  The outfall

23

24

1   discharges storm water and pollutants contained in that storm water that eventually discharges

2   into the San Francisco Bay, a navigable Water of the United States.

3   67.   Plaintiff is informed and believes, and thereupon alleges that the storm water flows over

4   the surface of the Facility where industrial activities occur and areas where airborne materials

5   associated with the industrial processes at the facility may settle onto the ground.   Plaintiff is

6   informed and believes, and thereupon alleges that storm water flowing over these areas collects

7   suspended sediment, dirt, metals, and other pollutants as it flows towards the storm water

8   channels.

9   68.   On information and belief, Plaintiff alleges that there are insufficient structural storm

10   water control measures installed at the Facility.  Plaintiff is informed and believes, and thereupon

11   alleges, that the management practices at the Facility are currently inadequate to prevent the

12   sources of contamination described above from causing the discharge of pollutants to waters of

13   the United States.

14   <u>Defendant's Notice of Intent Was Not Signed by the Facility's Legally Responsible Person</u>

15   69.   Section XXI.K of the General Permit provides all Permit Registration Documents

16   ("PRD") for the Notice of Intent ("NOI") coverage be certified and submitted via SMARTS by

17   the Facility's Legally Responsible Person ("LRP"). All other documents may be certified and

18   submitted via SMARTS by an LRP or by their designated Dully Authorized Representative

19   ("DAR"). When a new LRP or DAR is designated, the Facility shall ensure that the appropriate

20   revisions are uploaded to SMARTS. Documents certified and submitted to SMARTS by an

21   unauthorized or ineligible LRP or DAR are considered invalid and a violation of the General

22   Permit.

23

24

70.     Section XXI.K.4.a of the General Permit provides that LRP eligibility for a corporation is limited to the corporation's responsible corporate officers, including its president, secretary, treasurer or vice president in charge of a principal business functions or corporation's facility manager.

71.     On information and belief, Plaintiff alleges the Facility applied for NPDES coverage under the General Permit on May 6, 2015 and their NOI application was certified by Sharon Sims which indicated she was the Legally Responsible Party for Defendant SHASTA BEVERAGES.

72.     On information and belief, Plaintiff alleges that the SWPPP for 2015-16 reporting year did not indicate that Ms. Sims was the LRP for Defendant.

73.     On information and belief, Plaintiff alleges that the Facility reapplied for NPDES coverage under the General Permit on July 21, 2020 and that the NOI application was certified by Noel Megia which indicated that he was the Legally Responsible Person for Defendant SHASTA BEVERAGES.

74.     On information and belief, Plaintiff alleges that the SWPPP did not indicate that Mr. Megia was the LRP for Defendant SHASTA BEVERAGES and did not indicate he would be replacing Ms. Sims as the new LRP for Defendant SHASTA BEVERAGES.

75.     On information and belief, Plaintiff alleges that Ms. Sims and Mr. Megia are neither responsible corporate officers nor are they the corporation's facility manager and thus are ineligible LRPs, in violation of the General Permit.

Deficient SWPPP and Site Map

76.     On information and belief, Plaintiff alleges that since at least the beginning of the Facility's operations, Defendant SHASTA BEVERAGES has failed to develop an adequate

SWPPP and a Site Map for the Facility as detailed in Plaintiff's 60-Day Notice attached hereto as Exhibit A and incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

77.    On information and belief, EDEN alleges that the Facility has failed to upload an adequate revised SWPPP pursuant to Section X *et seq*. of the General Permit.

<u>Failure to Conduct an Evaluation and to Submit Level 1 ERA Report For pH</u>

78.    On information and belief, Plaintiff alleges that the Facility exceeded the EPA Benchmark and annual NAL for pH for the reporting year 2015-16 which caused Defendant to enter Level 1 status on July 1, 2016, in violation of Section XII *et seq*. of the General Permit.

79.    On information and belief, EDEN alleges that Defendant was required to have a Qualified Industrial Storm Water Practitioner ("QISP") conduct an Evaluation of the Facility by October 1, 2016, and to upload an adequate Level 1 ERA Report for pH on or before January 1, 2017.

80.    On information and belief, EDEN alleges that the Facility has failed to have a QISP conduct an adequate Level 1 status Evaluation for pH of the Facility by October 1, 2016.

81.    On information and belief, EDEN alleges that the Facility has failed to submit a Level 1 ERA Report for pH by uploading it to SMARTS on or before January 1, 2017.

82.    Everyday Defendant conducts operations at the Facility without conducting an adequate Level 1 status Evaluation and without submitting an adequate Level 1 ERA Report is a separate and distinct violation of the General Permit.

//

//

//

1

<u>Failure to Submit Level 1 ERA Report for Total Suspended Solids (TSS)</u>

2    83.    On information and belief, Plaintiff alleges that the Facility exceeded the EPA

3  Benchmark and annual NAL for TSS for the reporting year 2017-18 which caused Defendant to

4  enter Level 1 status on July 1, 2018, in violation of Section XII *et seq.* of the General Permit.

5    84.    On information and belief, EDEN alleges that the Facility was required to have a

6  Qualified Industrial Storm Water Practitioner ("QISP") conduct an Evaluation of the Facility by

7  October 1, 2018, and to upload an adequate Level 1 ERA Report for TSS on or before January 1,

8  2019.

9    85.    On information and belief, EDEN alleges that the Facility has failed to have a QISP

10  conduct an adequate Level 1 status Evaluation for TSS of the Facility by October 1, 2018.

11    86.    On information and belief, EDEN alleges that the Facility has failed to submit a Level 1

12  ERA Report for TSS by uploading it into the SMARTS system on or before January 1, 2019.

13    87.    Everyday Defendant conducts operations at the Facility without conducting an adequate

14  Level 1 status Evaluation and without submitting an adequate Level 1 ERA Report is a separate

15  and distinct violation of the General Permit.

16    <u>Failure to Submit Level 2 ERA Action Plan for pH</u>

17    88.    On information and belief, EDEN alleges that the Facility, while in Level 1 status,

18  exceeded the EPA Benchmark and annual NAL for pH for the reporting year 2017-18 and these

19  results elevated Defendnat to Level 2 status on July 1, 2018, in violation of Section XII *et seq.* of

20  the General Permit.

21    89.    On information and belief, EDEN alleges that Defendant was required to have a QISP

22  certify and upload to SMARTS a Level 2 Action Plan that addresses each new Level 2 EPA

23  Benchmark and annual NAL exceedance at the Facility on or before January 1, 2019.

24

90.     On information and belief, EDEN alleges that Defendant has failed to upload to SMARTS a Level 2 Action Plan for pH on or before January 1, 2019.

91.     Everyday Defendant conducts operations at the Facility without preparing a Level 2 Action Plan is a separate and distinct violation of the General Permit.

Failure to Submit Level 2 ERA Technical Report for pH

92.     On information and belief, EDEN alleges that Defendant, while in Level 1 status, exceeded the EPA Benchmark and annual NAL for pH for the reporting year 2017-18 and these results elevated Defendant to Level 2 status on July 1, 2018, in violation of Section XII *et seq.* of the General Permit.

93.     On information and belief, EDEN alleges that Defendant was required to have a QISP certify and upload to SMARTS a Level 2 Technical Report that addresses each new Level 2 EPA Benchmark and annual NAL exceedance at the Facility.

94.     On information and belief, EDEN alleges that after Defendant enter Level 2 status for pH, Defendant failed to upload to SMARTS a Level 2 Technical Report on or before January 1, 2020.

95.     Everyday Defendant conducts operations at the Facility without preparing a Level 2 Technical Report for pH is a separate and distinct violation of the General Permit.

Monitoring and Reporting – Monthly Visual Observations

96.     On information and belief, EDEN alleges that Defendant SHASTA BEVERAGES do not have an adequate storm water monitoring program at its Facility since at least the beginning of the Facility's operations, as required by Section XI.A of the General Permit.

97.     On information and belief, EDEN alleges that Defendant has failed to conduct monthly visual observations of storm water discharges at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

98.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

<u>Failure to Collect and Analyze Storm Water Samples</u>

99.     The Defendant SHASTA BEVERAGES is required to collect and analyze two storm water samples from the first half of the reporting year (July 1 to December 31) and two storm water samples for the second half of the reporting year (January 1 to June 30), pursuant to Sections XI.B2 and XI.B11.a of the General Permit.

100.    On information and belief, Eden alleges that Defendant SHASTA BEVERAGES failed to collect and analyze the required number of storm water samples at the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

101.    On information and belief, EDEN alleges that during the 2017-2018 reporting year, Defendant failed to collect and analyze one storm water sample from the first half of the reporting year.

102.    On information and belief, EDEN alleges that during the 2018-2019 reporting year, Defendant failed to collect and analyze one storm water sample from the first half of the reporting year.

103.    On information and belief, EDEN alleges that during the 2019-2020 reporting year, Defendant failed to collect and analyze one storm water sample from the first half of the reporting year.

104.     On information and belief, EDEN alleges that during the 2020-2021 reporting year, Defendant failed to collect and analyze one storm water samples from the first half of the reporting year.

105.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

<u>Failure to Collect Storm Water Samples During Qualified Storm Events</u>

106.     On information and belief, EDEN alleges that Defendant has taken samples of storm water discharges at the Facility that failed to comply with the General Permit's requirement that storm water samples be preceded by a period without a discharge, pursuant to Section XI.B of the General Permit.

107.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on November 2, 2015 was made on the second consecutive day of rainfall on that date in violation of the General Permit.

108.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 14, 2016 was made on the second consecutive day of rainfall on that date in violation of the General Permit.

109.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on January 10, 2017 was made on the second consecutive day of rainfall, in violation of the General Permit.

110.     On information and belief, EDEN alleges that Defendant's collection of storm water samples on February, 2017 was made on the second consecutive day of rainfall, in violation of the General Permit.

1    111.    On information and belief, EDEN alleges that Defendant's collection of storm water

2    samples on May 19, 2020 was made on the second consecutive day of rainfall, in violation of the

3    General Permit.

4    112.    Information available to EDEN indicates that as a result of these practices, storm

5    water containing excessive pollutants is being discharged during rain events from the Facility to

6    the San Francisco Bay.

7        Failure to Report pH Correctly

8    113.    The General Permit requires that field (on Site) storm water sample holding time for pH

9    analysis is fifteen (15) minutes and that samples sent to a laboratory for analysis exceed that limit

10   and are considered invalid pursuant to Section XI.C.2.a of the General Permit.

11   114.    On information and belief, EDEN alleges that some of Defendant's laboratory reports

12   showed evidence that the field (on Site) litmus testing for pH were not conducted within the 15-

13   minute holding time in violation of the General Permit.

14   115.    On information and belief, EDEN alleges that Defendant's laboratory report dated

15   November 10, 2015 demonstrate the litmus test for the Facility's pH was not conducted within

16   the required 15-minute holding time as required under the General Permit.

17   116.    On information and belief, EDEN alleges that Defendant's laboratory report dated

18   December 16, 2015 demonstrate the litmus test for the Facility's pH was not conducted within

19   the required 15-minute holding time as required under the General Permit.

20   117.    Information available to EDEN indicates that as a result of these practices, storm

21   water containing excessive pollutants is being discharged during rain events from the Facility to

22   the San Francisco Bay.

23       //

24

COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, CIVIL PENALTIES AND REMEDIATION
Page 23

<u>Failure to Generate Valid Ad Hoc Monitoring Reports</u>

118.    Section XI.B.11 of the General Permit requires Defendant to generate Monitoring Reports for all stormwater sampling and analytical test results. The State Water Resources Control Board requires Facility's to generate an Ad Hoc Monitoring Report by manually uploading to SMARTS all sampling and analytical test results received from a Facility's laboratory. (*Discharger's Guide to the Stormwater Multiple Application Tracking System (SMARTS)*, *Ad Hoc Monitoring Report,*" Rev. 5/20/21, p. 1.) Simply uploading the laboratory reports as an attachment to the Ad Hoc Report or as a separate document to SMARTS and not entering the actual test results data, is a violation of the General Permit. The test results, once entered, will automatically calculate the Facility's annual NALs to determine whether the Facility had entered either Level 1 or Level 2 status.

119.    On information and belief, EDEN alleges that Defendant failed to generate the required Ad Hoc Monitoring Report by not manually entering into SMARTS all sampling and analytical test results received from their laboratory, in violation of the General Permit.

120.    On information and belief, EDEN alleges that Defendant's failure to manually enter test results to SMARTS and only upload laboratory report(s), was done in order to avoid and prevent the SMARTS system from calculating Level 1 and Level 2 status for Defendant, in violation of the General Permit.

121.    Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

//

//

1

<u>Failure to Upload Storm Water Sample Analyses Within 30 Days</u>

2

122.    Section XI.B.11.a of the General Permit requires Defendant to submit sampling and

3

analytical test results for all storm water sampling and analytical results into the SMARTS

4

system within thirty (30) days.

5

123.    On information and belief, EDEN alleges that Defendant failed to upload into SMARTS

6

all storm water sampling and analytical results within 30 days, a violation of the General Permit.

7

The following chart demonstrates the approximate number of days Defendant was late uploading

8

storm water samples. The calculation is as of the date of Plaintiff's 60-Day Notice.

9

10

| Sample Date | Date of Laboratory Report | Date Uploaded into SMARTS | Length of Time Late |
|---|---|---|---|
| 11/02/2015 | 11/10/2015 | 06/06/2016 | 179 |
| 12/03/2015 | 12/16/2015 | 06/06/2016 | 143 |
| 01/14/2016 | 02/02/2016 | 06/06/2016 | 95 |
| 02/18/2016 | 03/01/2016 | 06/06/2016 | 67 |
| 12/08/2016 | 12/16/2016 | Not uploaded | 1710 |
| 12/15/2016 | 12/30/2016 | Not uploaded | 1696 |
| 01/10/2017 | 01/26/2017 | Not uploaded | 1669 |
| 02/07/2017 | 02/24/2017 | Not uploaded | 1640 |
| 11/04/2017 | 11/15/2017 | Not uploaded | 1376 |
| 01/08/2018 | 01/26/2018 | Not uploaded | 1304 |
| 02/26/2018 | 03/07/2018 | Not uploaded | 1264 |
| 11/29/2018 | 12/11/2018 | Not uploaded | 985 |
| 01/15/2019 | 01/28/2019 | Not uploaded | 937 |
| 03/05/2019 | 03/15/2019 | Not uploaded | 891 |
| 03/20/2019 | 04/12/2019 | Not uploaded | 863 |
| 12/04/2019 | 01/07/2020 | Not uploaded | 593 |
| 01/16/2020 | 02/04/2020 | Not uploaded | 565 |
| 03/28/2020 | 04/06/2020 | Not uploaded | 503 |
| 05/19/2020 | 06/03/2020 | Not uploaded | 445 |
| 11/17/2020 | 12/07/2020 | Not uploaded | 258 |
| 01/04/2021 | 01/27/2021 | Not uploaded | 207 |
| 03/10/2021 | 03/25/2021 | Not uploaded | 150 |
| 04/25/2021 | 05/10/2021 | Not uploaded | 104 |

<u>Failure to Provide the Method Detection Limit From a "Non-Detect" Sample Result</u>

124.    Section XI.B.11.b of the General Permit requires Defendant to provide the method detection limit when analytical results from storm water samples are reported by the laboratory as a "non-detect" or less than the method detection limit and Defendant is prohibited from reporting a value of zero.

125.    On information and belief, EDEN alleges that on June 7, 2016, Ms. Sharon Sims submitted an Ad Hoc Monitoring Report for reporting year 2015-16 that contained values of zero or blank values for the parameters of Oil and Grease (O&G) from laboratory results that reported analytical results as ND or "Non-Detect," in violation of the General Permit.

126.    On information and belief, EDEN alleges that Defendant failed to report the method detection limit in violation of the General Permit.

<u>Falsification of Annual Reports</u>

127.    EDEN is informed and believes that Defendants have submitted falsified Annual Reports to the Regional Water Quality Control Board in violation of Sections XXI.L and XXI.N of the General Permit.

128.    Section XI.B of the General Permit provides that the Facility must collect and analyze two storm water samples in the first half of each reporting year (July 1 to December 31), and two samples in the second half of each reporting year (January 1 to June 30).  However, as discussed above, Defendant failed to collect and analyze all the required storm water samples during the 2017-18, 2018-19 and 2019-20 reporting years.

129.    On July 7, 2018, July 15, 2019 and July 22, 2020 Defendant submitted its Annual Reports for the Fiscal Years 2017-18, 2018-19 and 2019-20. Ms. Sharon Sims signed the Annual Reports for the reporting years 2017-18 and 2018-19 under penalty of perjury as the Designated

1   Authorized Representative ("DAR"). Mr. Noel Megia signed the Annual Report for the reporting

2   year 2019-20 under penalty of perjury as the DAR

3   130.    Both Ms. Sim and Mr. Megia responded "Yes" to Question No. 3 on their Annual

4   Reports ("Did you sample the required number of Qualifying Storm Events during the reporting

5   year for all discharge locations, in accordance with Section XI.B?")  However, as noted above,

6   Defendant has failed to collect and analyze all the required storm water samples during 2017-18,

7   2018-19 and 2019-20 reporting years.

8   131.    If a Facility does not collect four storm water samples during a particular reporting year,

9   the reporting requirements of the General Permit require the Facility to indicate "NO" to

10   Question NO. 3 on the Facility Annual Report and to provide an explanation for why the

11   required number of samples were not collected. The explanation as to why there were

12   insufficient QSEs is to be provided in Attachment 1 to the Annual Report.

13   132.    Records from the National Oceanic and Atmospheric Administration (NOAA)

14   website/database confirm that during the reporting years 2017-18, 2018-19 and 2019-20, there

15   were sufficient Qualified Storm Events (QSEs) occurring near the Facility during or within 12

16   hours of the start of regular business hours to allow Defendant to collect the requisite number of

17   samples. Further, there were other Facilities near the Defendant's Facility that were able to

18   collect the required number of storm water samples during the Reporting Years.

19   133.    Based on the foregoing, it is clear that Defendant's DARs intentionally made false

20   statements in the Facility's Annual Reports when they indicated that the Facility had collected

21   samples according to Section XI.B of the General Permit during the reporting years when in fact

22   the Facility did not collect the required number of samples.

23   //

24

1    <u>Failure to File Timely Annual Reports</u>

2    134.    EDEN is informed and believes that Defendants have failed to comply with Section

3    XVI.A of the General Permit, which provides that Dischargers shall certify and submit by way of

4    SMARTS an Annual Report no later than July 15th following each reporting year.

5    135.    The Annual Report shall include a Compliance Checklist that indicates whether the

6    Discharger has addressed all the General Permit requirements; an explanation for any non-

7    compliance with the General Permit requirements, and an identification of all revisions made to

8    the SWPPP within the reporting year.

9    136.    On information and belief, Eden alleges that Defendants Annual Reports for the reporting

10   years 2019-20 was (7) seven days late in violation of the General Permit.

11   <u>Failure to Implement BAT/BCT and BMPs</u>

12   137.    EDEN is informed and believes that Defendant SHASTA BEVERAGES has failed, since

13   at least the beginning of the Facility's operations, to identify and implement Best Management

14   Practices ("BMPs") at its Facility that comply with the requirements of the General Permit for

15   best conventional treatment (BCT) for conventional pollutants, and best available technology

16   (BAT) for toxic and non-conventional pollutants. These technology-based pollution controls are

17   required to be implemented in a manner that reflects best industry practice considering

18   technological availability and economic practicability and achievability.  General Permit

19   Sections I.C, V.A.

20   138.    Information available to EDEN indicates that as a result of these practices, storm water

21   containing excessive pollutants is being discharged during rain events from the Facility to the

22   San Francisco Bay.

23       //

24

Discharges of Contaminated Storm Water

139.     Information available to EDEN indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges in violation of the General Permit.

140.     Due to the nature of the operations at the Facility, coupled with the documented lack of proper BMP implementation and unauthorized non-storm water discharges, Defendant is discharging storm water containing excessive levels of pollutants specific to their operation during at least every significant local rain event.  These pollutants include storm water contaminated with pH affected substances, oil & grease ("O&G"), total suspended solids ("TSS").

141.     The levels of pH in storm water detected by the Facility has been outside the acceptable range of 6.5 – 8.5 S.U. stablished by the Basin Plan for pH.  For the Reporting Years 2015-16, 2016-17, 2017-18, 2018-19, 2019-20 and 2020-21, the level of pH measured from at least one of the Facility's storm water outfalls exceeded the Basin Plan's parameters.

142.     The levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Water Board. For the Reporting Year 2017-18 the TSS level at the Facility was measured at 259.67 mg/L which is 159.67 mg/L over the benchmark value and annual NAL for TSS.

143.     For the Reporting Year 2020-21, on November 17, 2020, the TSS level at the Facility was measured at 700 mg/L which is 600 mg/L over the benchmark value and annual NAL for TSS.

144.     For the Reporting Year 2020-21, on January 4, 2021, the TSS level at the Facility was measured at 390 mg/L which is 290 mg/L over the benchmark value and annual NAL for TSS.

145.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants, including, but not limited to, pH affected substances and TSS are being discharged during rain events from the Facility to the San Francisco Bay.

Failure to Train Employees

146.     Sections X.D.1 and X.H.f of the General Permit requires all Facilities to designate a Legally Responsible Person to implement the requirements of the Permit, who is then responsible for appointing a Pollution Prevention Team and ensuring that the Team is properly trained in at least the following minimum requirements: BMP implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

147.     Defendant's failure to train its employees and designate a Pollution Prevention Team is evidenced by the Facility's failure to develop and implement a satisfactory SWPPP or adequate BMPs at the Facility, failure to conduct monthly visual observations, and failure to comply with required storm water sampling and analysis procedures.

148.     On information and belief, Eden alleges that Defendant SHASTA BEVERAGES failed to appoint a Pollution Prevention Team and/or adequate train its pollution prevention team for the Facility since at least the beginning of the Facility's operations, as required by the General Permit.

149.     Information available to EDEN indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events from the Facility to the San Francisco Bay.

150.     Information available to Plaintiff indicates that Defendant has not fulfilled the

requirements set forth in the General Permit for discharges from the Facility due to the continued

discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon

alleges, that all the violations alleged in this Complaint are ongoing and continuing.

**FIRST CAUSE OF ACTION**
**Failure to Develop a Storm Water Pollution Prevention Plan**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

151.   Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth

herein.

152.   The General Permit requires dischargers of storm water associated with industrial activity

to develop and implement a SWPPP and create a compliant Site Map.

153.   As outlined herein, Defendants have failed to develop and implement an adequate

SWPPP or Site Map for the Facility.

154.   Each day since at least the beginning of the Facility's operations, that Defendants failed

to develop an adequate SWPPP an Site Map for the Facility is a separate and distinct violation of

the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against all Defendants.

**SECOND CAUSE OF ACTION**
**Failure to Develop a Monitoring and Reporting Program**
**(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

155.   Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth

herein.

156.   The General Permit requires dischargers of storm water associated with industrial activity

to have developed and be implementing a monitoring and reporting program (including sampling

and analysis of discharges) that complies with the terms of the General Permit.

157.   As outlined herein, Defendant has failed to develop and implement a monitoring and

reporting program for its Facility.

158.    Defendant's ongoing failure to develop and implement a monitoring and reporting program are evidenced by its failure to collect storm water samples pursuant to the requirements of the General Permit.

159.    Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement a monitoring and reporting program for its Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant. The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

**THIRD CAUSE OF ACTION**
**Failure to Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

160.    Plaintiff re-alleges and incorporates all the preceding paragraphs as if fully set forth herein.

161.    The General Permit's SWPPP requirements and Effluent Limitation Section V.A of the General Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

162.    Defendant has failed to implement BAT and BCT at the Facility for pollutants of pH affected substances, Total Suspended Solids ("TSS") and Oil & Grease and other potentially un-monitored pollutants, in violation of Effluent Limitation Section V.A of the General Permit.

163.    Each day since at least the beginning of the Facility's operations, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant.

**FOURTH CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
**in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311, 1342)**

164.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

165.    Discharge Prohibition Section III.C of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Section VI.B of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment. Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

166.    Plaintiff is informed and believes, and thereupon alleges, that since at least the beginning of the Facility's operations, Defendant has been discharging polluted storm water from the Facility, in excess of applicable water quality standards in violation of Receiving Water Limitation Section VI.A and Discharge Prohibition Section III.D of the General Permit.

167.    During every rain event, storm water flows freely over exposed materials, waste products, and other accumulated pollutants at the Facility, becoming contaminated with the pollutants of pH affected substances, Total Suspended Solids ("TSS"), Oil & Grease (O&G) and other potentially un-monitored pollutants at levels above applicable water quality standards. The storm water then flows untreated into San Francisco Bay.

168.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water

quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional

Board's Basin Plan in violation of Receiving Water Limitations of the General Permit.

169.    Plaintiff is informed and believes, and thereupon alleges, that these discharges of

contaminated storm water are adversely affecting human health and the environment in violation

of Receiving Water Limitations of the General Permit.

170.    Every day since at least the beginning of Facility's operations, that Defendant has

discharged and continues to discharge polluted storm water from its Facility in violation of the

General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §

1311(a) against the Defendant.  These violations are ongoing and continuous.

### FIFTH CAUSE OF ACTION
**Failure to Properly Train Facility Employees and Pollution Prevention Team**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

171.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth

herein.

172.    Section X.D.1 of the General Permit requires each Facility to establish a Pollution

Prevention Team who is then responsible for assisting with the implementation of the

requirements of the General Permit. The Facility is also required to identify alternate team

members to implement the SWPPP and conduct required monitoring when the regularly assigned

Pollution Prevention Team members are temporarily unavailable (due to vacation, illness, out of

town business, or other absences).

173.    Section X.H.f of the General Permit also requires that each facility ensure that all of its

Pollution Prevention Team members implementing the various compliance activities of the

General Permit are properly trained in at least the following minimum requirements: BMP

1   implementation, BMP effectiveness evaluations, visual observations, and monitoring activities.

2   Further, if a Facility enters Level 1 status, appropriate team members must be trained by a QISP.

3   174.   Since at least the beginning of Facility's operations, Defendant has failed to properly

4   train Facility employees and the designated members of its Pollution Prevention Team, which

5   has resulted in the General Permit violations alleged herein.

**SIXTH CAUSE OF ACTION**
**False Certification of Compliance in Annual Report**
**(Violations of Permit Conditions and the ACT, 33 U.S.C. §§ 13311, 1342)**

175.   Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth

herein.

176.   Plaintiff is informed and believes, and thereon alleges that Defendant has falsely certified

compliance with the General Permit in each of its Annual Reports submitted to the Regional

Water Board for the reporting years 2015-16 to the present reporting year.

177.    Section XI.B.2 of the General Permit requires that all Facilities collect and analyze storm

water samples from two Qualifying Storm Events ("QSEs") within the first half of each reporting

year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year

(January 1 to June 30).

178.   Section XI.C.6.b of the General Permit provides that if samples are not collected pursuant

to the General Permit, an explanation must be included in the Annual Report.

179.   Plaintiff is informed and believes, and thereon alleges that Defendant violated the

General Permit by falsely answering "Yes" to question number three (3) in the Annual Reports

and certifying that Defendant had collected and analyzed the required number of storm water

samples during the reporting year(s) at issue.

180.    Section XI.B.5 of the General Permit requires that all of the Facility's storm water samples be collected within four (4) hours of the start of a discharge or at the start of the Facility's operations for QSEs occurring within the previous 12-hour period.

181.    Plaintiff is informed and believes, and thereon alleges that Defendant violated the General Permit by falsely answering "Yes" question number nine (9) of the Annual Reports and certifying that Defendant's storm water samples were collected within the time periods of Section XI.B.5 of the General Permit.

182.    Each day since at least the beginning of the Facility's operations that Defendant has falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a) against the Defendant.

**SEVENTH CAUSE OF ACTION**
**Recovery Under the Catalyst Theory CCP §1021.5**

183.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

184.    Under the substantive law of California, if a plaintiff is a catalyst in encouraging a Defendant to voluntarily comply with its legal obligations, the plaintiff may recover its fees and costs. *Graham v. DaimlerChrysler Corp.*, 101 P.3d 140, 21 Cal. Rptr. 3d 331, 34 Cal. 4th 553 (2004), *Tipton-Wittingham v. City of Los Angeles* (Cal.Dec. 2, 2004), 34 Cal.4th 604, 21 Cal.Rptr.3d 371, 101 P.3d. 174, 2004 Cal. LEXIS 11335.

185.    A requirement for recovery under the catalyst theory is that a plaintiff first advise the Defendant of the claim and provide an opportunity to resolve the matter.  The Plaintiff in this case complied by providing both the catalyst and the written notice of the claim to Defendant prior to suit as demonstrated in EDEN's Notice of Intent to Sue attached hereto as Exhibit A and

incorporated herein by reference. (Exhibit A, "60-Day Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act ("Clean Water Act").")

186.    In the event Defendants allege the claims are moot or are non-justiciable, then Plaintiff must be awarded its fees and costs under California Code of Civil Procedure Section 1021.5 ("Catalyst Theory").

187.    Since the substantive law of California governs awards of Catalyst Theory fees (as opposed to Federal law), Plaintiff requests the Court exercise supplemental jurisdiction over any award of Catalyst Theory fees.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment providing the following relief:

1.    Declare Defendant to have violated and to be in violation of the CWA;

2.    Issue an injunction ordering Defendant to immediately operate the Facility in compliance with the NPDES permitting requirements contained in the General Permit and the CWA;

3.    Enjoin Defendant from discharging pollutants from Defendant's Facility to the surface waters surrounding the Facility until such time as Defendant has developed and implemented an adequate SWPPP and implemented appropriate BMPs;

4.    Order Defendant to pay civil penalties of $51,570 per day/per violation for each violation of the Act pursuant to 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1, 19.2-19.4;

5.    Order Defendant to take appropriate actions to restore the quality of United States waters impaired by its activities at Defendant's Facility;

6.      Order Defendant to pay EDEN's reasonable attorneys' fees and costs (including expert witness fees), as provided by 33 U.S.C. § 1365(d) and applicable California law;

7.      Award Plaintiff additional attorney fees under California Code of Civil Procedure §1021.5, to the extent that Plaintiff's Notice of Intent to Sue directed to Defendant was the catalyst for Defendants' voluntary corrective action or cessation of the violations included in Plaintiff's Notice, provided that Defendant undertook any such corrective action after receiving Plaintiff's Notice, and;

8.      Award such other and further relief as may be just and proper.

Dated:  October 15, 2021            Respectfully,


By: */s/ Craig A. Brandt*
    Craig A. Brandt
    Attorney for Plaintiff